Good morning, Your Honors. My name is Deputy Attorney General Isaac Ickes, and I represent Amy Leskovic, Ivelanika Obai-Harrod, and Dino St. Augustine, our employees of Child Welfare Services. Yes. I'd like to begin by discussing the second prong of the Qualified Immunity Analysis, and that is whether a right was clearly established or not. Now, when we ask that question, if the answer to that question is no, then a right is not clearly established and Qualified Immunity . . . The problem you've got, we understand this principle really well, if I can jump right to it, because this case is thorny, but we have recognized that there's a clearly established right to familial association. It's not unqualified, and the question is going to be the breadth of it. So, could you cut to that level, rather than talking about the 30,000-foot level? Sure, Your Honor. Now, on the level of the specific circumstances of this case, there is no clearly established right to the custody, care, and control of one's children while one is barred from contacting them by court order. Okay, let me stop you for a second and ask you, you're sort of talking about this with this broad generality, but there are really, as I see it, two separate time periods we're talking about. There is whether or not removal was authorized by the TRO on December 20th, and then there's the separate issue of after the TRO was dissolved on December 31st, whether or not there was an authorization or justification for keeping Beattie in your custody. And so, I really want to talk about these things as two separate time periods, because I think the claim, as I read it, really talks about two time periods, not just sort of an overarching was there an order authorizing removal, and the reasonableness analysis asks whether there was an order authorizing it or whether or not there was an imminent danger or risk of serious bodily injury. But I think you need to do that analysis with respect to two separate time periods. Sure, Your Honor. Now, with respect to the December 20th, Family Court on Kauai had made a probable cause finding that abuse had occurred, threats of abuse were probable to occur so as to create a risk of imminent harm. There was already a probable cause finding made on that on the first page of the temporary restraining order. Now... Didn't Leskovec rate David a three on a 51 point scale with respect to risk of harm? So the rating did happen, Your Honor. Now, I think the critical difference here, though, separating this case from the lengthy jurisprudence that we have in the Ninth Circuit is that the order that was valid, that was issued by the Family Court, barred contact between Hanna and BD. Okay, so you're relying on the TRO, not the risk of bodily injury or imminent harm. You're relying on the TRO. Well, Your Honor, I would... The TRO is one set of circumstances that we're relying on here. I would just also like to note that... I think it is an important question. I think it is a really important question. At the time that the child was removed, the initial removal on December 20, I think you say it two ways. And to follow up on Judge Desai's point, I think in one place, at least one, the government takes the position that the child was removed because there had been a finding by the Superior Court in Kwai and a no contact order imposed. But there's also a question about whether or not the state was invoking its statutory right to remove a child if there's an imminent risk. And I don't think you're consistent on that point. Okay, so... I just want a yes or no. Were you operating pursuant to both or one strand of authority? I guess the best answer to the question would be no to the second. Yes to the first, but with some qualifiers. Okay. You're operating... Okay. This shouldn't be hard and it isn't intended to be tricky. You were operating apparently according to the no contact order and what? What's the qualification you want to give us? I just wanted to note that when... I wanted to note that when Judge Seabright did view the video, in this case, he did note in his order that the description given by Ms. Kaulukukui was essentially verified by Judge Seabright's viewing of the order. So he did... The judge was very clear about that, but I'm not sure how it helps you. What he was saying essentially is that there was a no contact order entered as Judge Desai pointed out and Judge Seabright has said that was well-founded. He understood why that was entered. He called it disturbing and bizarre behavior. Right, so... Okay, but back to what we're talking about. The first period that Judge Desai is trying to get you focused on, right? Beginning December 20th when the child was removed, you operated pursuant to, I think, the TRO, right? No contact order, yes, Your Honor. The TRO. Since we're going to look at that period, is there any question that the principal told the social workers that the child was not to be removed by the father? Father did not have custody. Is that a disputed point? That's not a point we're disputing right now, Your Honor. Okay, and then my second question is, did the defendants do anything to investigate why dad didn't have custody before they removed her? I guess they used the word transferred her into his care. No, the defendants did look into the matter, speak with Mr. Kealohalolo. Beyond talking to the father, did they look into anything? Of course, there's a court record, there's a public record. In fact, I think there's a history of these people having quite a contentious history with Child Protective Services. I'm not asking about whether they talked to the dad. I'm trying to figure out whether they did anything objectively to investigate why dad didn't have custody. Now, I would just like to note that the order in this case was sealed. It's not a publicly accessible order. Okay, so they couldn't look there, but what did they do? Did they do anything? I'm just looking for anything in the record that tells me they did something. Spoke to the father, spoke to the mother, requested copies of the order from either of them, and did not receive from either mother or father. There was some paperwork that the social worker was shown by the principal. Is that right? Yes, Your Honor. What did that tell the social worker? Now, the emergency card at issue here, I have it written down. So, the emergency card erroneously noted that Keahiolalo is prohibited from having any contact with BD. However, that's not a true statement. Looking at the actual text of the 2012 order, there is no contact order between Mr. Keahiolalo and BD. The no contact order on the 2012 order barred contact between Keahiolalo and Hannah David. So, the premise is flawed to begin with. The information available to the social worker in the principal's office was that in the emergency, the child was not to be released to her father, right? I guess I would submit that the card said what the card said. And is that what the card said? I'm not trying to give you a hard time. That's what the card said, and I understand your position is the card was incorrect. Is that right? Yes, Your Honor. From my notes, the card said father is prohibited from having any contact with BD, and that was erroneous. With the mother, yeah. BD, the daughter. With the daughter, okay. Yeah. Let me ask you this. What evidence do we have that any of your clients knew about the 2012 order, and when did they know that? So . . . At some point, of course, they do know about it, but what's the earliest at which they could have known about that? As far as the 2012 order goes, their first knowledge of it came from Hannah. Hannah told them, I have a 21-year TRO against Keahi Olalu when Ms. Leskovic visited Hannah at her home. So Mr. St. Augustine inquired with Mr. Keahi Olalu about it. Ms. Keahi Olalu said, you know, I have a lot of paperwork I can give you. So that's December 18th then, that they first are aware of that? Yes, Your Honor. And despite their being aware of this, then they do all these things? Well, Your Honor, I can kind of go through the sequence of events. I think that might be helpful. Okay. So they hear about a 21-year TRO from Hannah David. Ms. Leskovic tries to see if there is a TRO, because those were the words that Ms. David used, and there wasn't a TRO. What speculate was going on was Ms. David misidentified the 2012 stipulated order as a TRO, which I guess is understandable. Now, on Kauai, Ms. St. Augustine spoke with Mr. Keahi Olalu about, you know, are there any court orders that you want to give us, or are there any legal documents that we should have? Ms. Keahi Olalu says, you know, I have a stack like this, I can give them to you, but that just didn't come about within the time between then and the school. So, under 587A8, Hawaii revised statutes, the police, generally in temporary foster custody situations, will assume custody of a child, take it in, pass it to CWS, who then receives the child. Is that what happened in this case? I understood you to say you did not act pursuant to the emergency statute. No, Your Honor. That's not what happened in this case. And had that happened, a bunch of statutory safeguards would have kicked in about timing and hearings and whatnot, but my understanding is that is not what happened in this case. No, Your Honor. Okay. Okay. So, at that first step, when the police under 587A8, A9A, received the child, one option is to formally, you know, pass over custody to the department. Another option is to resolve the matter informally. And, you know, one of these methods is with a parent who is willing to provide a home. And in this case, that's apparent to, I guess, the government officials on the scene, was that there was a parent willing to provide a home, Mr. Keahi Olalo. The problem you have, counsel, is that parent, they had indications from the principal, you know, disinterested party, that he didn't have custody. And there doesn't seem to be any attempt to investigate why he didn't have custody. So, while I think there is, and certainly the district court thought there was strong reason for the no contact order to be entered, and I appreciate your clients are in the business of protecting children, but surely there's an option to remove the child from the home if they thought that was necessary and to place her in somewhere other than with the father, like in foster care or somewhere to keep her safe, if that was the concern. And I think Judge... They placed her off island. They placed her on a different island. So that's quite something. So, I mean, there are numerous instances just throughout life and, you know, our running of society where children are not allowed to be with their custodial parent. They have to go somewhere. And not all of those children go into temporary foster custody. You know, they can be informally placed with a non-custodial relative, for example. Sorry, Your Honor. I said yes, you're right. I'm a former superior court judge. I'm very familiar with that. And so your argument is that that's what they were doing here and they were excused from checking out dad to see whether dad was a safe custodian because why? Well, Mr. Stein-Augustine did assess Ms. Kaliolalo as a safe custodian when he visited him. This was prior to December 20th. Okay. I have another question, but I'm not sure if you've got an answer to yours yet. Well, my question is, at what point are they aware of the 2012 order? Because as soon as they're aware of that, I think they're in trouble in the sense of, well, they should have known better. They should have known that that December 4th, much later order, really wasn't going to work. Well . . . And as I read what the district judge did say, the district judge said, well, if they were aware of that earlier order, then I'm going to deny qualified immunity and we're going to go forward and find out. And you just told me that they were aware of that order on the 18th of December. Your Honor, I think the critical distinction, however, is that they are hearing, you know, one story from Hannah, hearing one story from Mr. Kaliolalo. The order is not publicly available. Well, publicly . . . And . . . I'm not sure, but I don't care about publicly available. When are your clients . . . when are these three people aware of it? Okay. My clients knew of the existence of an order from Hannah and Mr. Kaliolalo. Now, as to what specifically the order . . . May I just . . . to be clear, to answer Judge Fletcher's question, my understanding is as of the 18th, they had been told about the order by Hannah, but I don't think they saw the order, and I think that's what we're trying to get at, until December 31. Is that correct? Yes, Your Honor. Okay, and that's the day the TRO was dissolved. The TRO was dissolved as to . . . No contact order as to the one we care about, right. Okay, so I don't know if you've got an answer to your question. Okay. Okay. Actually, that helps because as I read the district court's order, he's trying to figure out, okay, when did they know about it so that we can charge them with knowledge of it? Maybe hearing about it vaguely is enough, maybe it isn't, and he may need more evidence on that, so I'm going to deny qualified immunity at this time. Okay, so after December 31st, that is when CWS put into, I guess, motion, the petition for a temporary foster custody, and the petition for a temporary foster custody was timely filed and ultimately was sustained by the family court. So could I stop you there? Yes, Your Honor. The December 31st hearing, at that point, it's uncontested. They've got . . . and I think what they said is, that's the first time we saw the order. That's my understanding, so you can correct me if I'm wrong. The TRO was dissolved, but there's still this concern about the child, because after all, there's this video that's very concerning about this incident, is my understanding. The question at that point is, what should they have done then? I think you're just getting to that point and telling me that they . . . telling us that they then initiated an emergency custody petition. Yes, Your Honor, they did. And since the child was in Kauai, what happened? Where was she placed? At first, on Kauai. I understand . . . Where? In temporary foster care? Temporary foster care on Kauai. So not in Ms. Kealoha's house. By the time the hearing on the petition came around, the child had been flown back to the Big Island. Well, Judge Dislai, I was trying to get you to look at these as two different periods of time, and so what's your best argument as to the second period of time, if it starts on December 31? I think the best argument here is that the family court, after hearing the evidence at a contested case hearing, sustained ultimately the department's  But you had to have justification in the first instance. I don't think you can back Dory in your justification because it was ultimately upheld or determined in the family court proceeding that it was permissible. What was the authority by which that removal occurred after the TRO was dissolved? Why was it  Okay. The December 31st hearing happened. There were no attorney generals at this hearing or anything like that. The order was brought to court by Ms. David's counsel. Ms. David's counsel emailed the order to a deputy attorney general other than myself. That deputy attorney general for the family law division then shared the order with CWS. CWS discussed what we do about this. At that point they had seen the video of Ms. David at the fire station assaulting Mr. Keahiolalo, and that was when the decision ultimately was forged to go ahead and file the petition for temporary foster custody. So there was an ongoing concern about the child's safety, I take it, because of the video at that point. Is that it? Yes, Your Honor. In addition to, I guess, just concerns over Ms. David, some for other behavior. All in, this is a period of 21 days. After the December 31 hearing, there were delays. Can you explain? I realize there's some holidays in there, but it's a very protracted period of time. There was a continuation of the hearing, the hearing after Ms. David had not been served, I think. Is that right? The first temporary restraining order hearing, Your Honor? No, the first hearing on the petition in the new year for temporary custody. I believe the parties met. I believe temporary supervision was awarded with strenuous conditions on Ms. David, and a return hearing was set for further testimony. I'm sorry, I wasn't present at those hearings, Your Honor. It was transferred to foster care on January 3rd. They filed a petition for protective custody on Hawaii on January 6th. On January 8th, the first hearing on temporary custody was continued until the 10th. I don't know why it was continued, but it was continued. And I think that might have been a service problem, but at any rate, at that point, basically then when the hearing was held, the child was returned with conditions. I believe that's the sequence of . . . You're way over your time, and we've taken your time with our questions, but before we hear from opposing counsel, I just want to see if there's anything further. I'm good for now. Okay. Why don't you have a seat, and we'll hear from opposing counsel. When you come back, we'll put two minutes on the clock. Thank you, Your Honor. Good morning. Thank you for the opportunity to appear. My name is Eric Seitz, and as you know, I represent Hannah David and her daughter, who I think now is sixteen or seventeen. I have written out what I was going to say to you about how outrageous this was, but rather than tell you what we think about this case, in light of the questions, the factual issues that you've raised, I would, I think, prefer to entertain your questions. So where would you like me to start? I would like to know what right your client is asserting in the 1983 action. Well, obviously, her familial right to custody of her daughter. It was not an unlimited right, and it's not an unqualified right, and there was an order that had been entered in Kauai finding that she was a danger. That's my paraphrase. Actually, no, that's not true. Well, there was a TRO . . . Temporary restraining order was issued in Kauai, ex parte, without any presentation . . . I know what ex parte means, sir. Without . . . You're expecting social workers to parse this, and that's really a tall order. We had nothing to do with the TRO, obviously. The TRO was issued ex parte without informing the court that the person seeking the TRO had had all of his rights, all of his rights terminated with respect to this child. Some of those allegations go to a fourth defendant who's not in front of us. We're looking at the social workers today. I understand, but when you talk about a TRO, was a TRO that was obtained, I would suggest fraudulently, and indeed the family court at the hearing and in his findings after the December 31st hearing was simply outraged about the way the matter had been handled. We know that, but remember what you were just reminded, opposing counsel was reminded by Judge Desai. We're looking at what people knew at the time . . . Yes. What the social workers knew at the time is that there's no contact order had been entered. In December 18th, by December 18th, there was a meeting that was conducted. It's reflected in the record in various emails with the social workers from Kauai and the child welfare workers from the island of Hawaii. It was also attended by a Deputy Attorney General. There was a discussion had there, which they've been very protective of because they say it's covered by attorney-client privilege, but Shawn Lathrop, who was the supervisor, who was a previous defendant in this case, clearly in emails before and after expressed serious concerns about the custodial status of the child and about whether or not there was authority to take any actions whatsoever with regard to custody of the child based simply upon a temporary restraining order that had obtained ex parte. Does it matter at all for your claim that the constitutional violation arose from the earlier date versus the later date? What does it matter if the denial of qualified immunity is a result of the December 31st period of time after the TRO had dissolved? I don't think ultimately it matters at all. But, again, the question has arisen, and I think Judge Seabright makes some comments and he's simply wrong, that he says that the child welfare people didn't seize the child on December. I find that sort of this disparagement of the court in calling the TRO fraudulent, all of these things, frankly, don't really help you at all and seems irrelevant from my perspective if what you're saying to me is that your claim is unaffected by the fact that the constitutional rights violated just the same after the TRO was dissolved on December 31st. Yes. We believe that the constitutional rights were implicated on December 20th when the child was first taken without any prior notice and despite a finding by child welfare at that point that she was safe and secure and there was no imminent risk of harm to her. Okay, so this gets back to what right your client is asserting, and you said the right to familial association, which is well recognized, but of course it's not unqualified. And so I'm trying to figure out, as of December 20th, you explained a minute ago your version of the facts about whether they did anything to determine why the father didn't have custody rights, because I think it's uncontested they'd at least been told that by the principal. Yes, they'd been told that by Hannah, and there had been discussion apparently among themselves about that question, and they showed up at the school, the social workers, with Dad, who they had arranged to bring for that purpose, and they called the Hawaii County Police. Counsel, we have read these briefs really carefully. I understand. We've got timelines, we've got charts, we've got graphs. I'm trying to get you to answer the question, if I could, about that constitutional right, which is not unlimited, and on the day the child was taken. I'm trying to figure out what your best argument is. And so my understanding is that on that day, you think they had, and Judge Siebert thought that what was pivotal was whether they had reason to know, because they thought a fact finder could decide that they did know about the status of the custody order on that day. And apparently, at least for qualified immunity purposes, that is a disputed fact right now, because they testified in their depositions, they didn't know. But there is ample evidence out there to question whether that's true. So I think the toughest argument for you, and, you know, I promise, we're tough on the other guy when he's at the podium too, but when you're at the podium, I have to ask you, your toughest argument, I think, is that what interfered with your client's right to familial association during this first period that Judge Desai has called our attention to is the findings that were made as a result of that fire station video. In other words, your client's right, which is not an unqualified right, was going to be infringed somewhat, I think if opposing counsel would argue, was going to be infringed because of that finding that the child was in danger, and the question was where was the child going to go when she was removed from your client's custody. So if we were to find that on this record, what would you say about whether your client's constitutional right was infringed? Well, first of all, I don't believe, and no judge who's seen the video has decided, that that was an adequate basis for removing the child. No judge has determined that. Eventually, in the family court on the Big Island, on January 10th, the judge looked at the video, came out, and said, there is insufficient evidence to remove this child from the mother based on the evidence I've heard, and that was after a day and a half of testimony. I think conditions were put in place. Then she asked, would we stipulate and agree to supervision? And we said, yes, of course, because we don't have nothing to hide. Hannah has been a wonderful mother to this child, a single mother, for all of her life, and we have no problem having other workers from CPW. We stipulated that the people involved in taking the child would not be involved in the supervision. But we have nothing to hide, no problem, and they did supervise the child for a period of about four months, and they concluded that further supervision was not necessary. My next question is, what should they have done on December 31 when the TRO was vacated? They had this video that you've described from your client's perspective, and they initiated a formal proceeding for temporary custody. Well, they didn't do it right away. They waited until, and it was a holiday weekend, I understand, but in the aftermath of what had happened, they could simply have gone to the family court judge, filed some sort of a petition for emergency custody, and had the judge determine whether there was an ample basis for that. They didn't do that. They left the child. The child left the courthouse under very tumultuous circumstances with her biological father, and it wasn't until several days later, after we filed this action in federal court, and after there was chatter, which is also in the record from the social workers back and forth, uh-oh, we're in trouble now, Eric Seitz has taken this case, and you can see that in there, that going back and forth, now we have to do something. So then all of a sudden they went running to court on the island of Hawaii while the child was still in Kauai, and they filed the family court action, which that judge ultimately heard and decided and returned the child immediately to mom. That's what happened. No judge has ever determined that it was justifiable to take this child from mother's custody, and they have argued various things at different times. They've argued that the TRO gave them authority. There's no legal basis for that whatsoever. Not the question, because they're talking about qualified immunity. I understand. The question is whether or not social workers could reasonably have made that mistake. They could be wrong, but just not unreasonable, and they'd still be entitled to qualified immunity, sir. They're not necessarily scholars in law. They do other things for a living. That's a triable issue, and when we get there, we will try the issue of what they knew. Then they did their initial assessment and found out that the home was safe. Can I back you up? When you said it's a triable issue, the one that you're referring to now is the one that Judge Seabright has isolated, but I was asking a different question. Would it be unreasonable for social workers to rely on a superior court order from Kauai? Yes. Why? You're talking about the TRO. I am. One, because they already had in their records previous complaints, and that's also in your record in the excerpts of the record. They knew about the tumultuous circumstances that existed between the parents going back to 2011. They knew that there were allegations of abuse. Now, there were no determinations, but they also then, and that should have been sufficient to trigger a very careful analysis, who has custody of this child and why. When you say they knew all these things, did they know, or was it in the record, the 2012 order? I don't think they had the 2012 order, the social workers. Gina certainly knew, the person from the police department who filed the complaint with them, but there was nothing that the social workers on Kauai knew, and there are in the e-mails. Until December 31, is that right? Apparently until December 31. Okay. Yes. Okay, I'm getting different answers then, and maybe I'm just mishearing these things. So we have the earlier order that says no contact. I think that's a 2012 order. Terminates father's rights altogether. Exactly right. Yes. And I was told a moment ago that they were made aware of that on December 18th. You're saying they really were not made aware of that until the 31st? They were made aware of it in two ways. One, because the father admitted that he had lost custody back in 2012. Okay, so when did he admit that? I'm after some dates. in connection with the talks, discussions about going over to pick up the child. So that would have been in that period between the 16th and the 20th of December. For me, and I may be misunderstanding some things here, but for me the issue on qualified immunity is at what point did the defendants here know that this December 4th order was actually fatally inconsistent with the earlier order that said no contact? Well, they certainly knew that by December 18th because Sean Lathrop raised those questions in the discussion and the meeting and in subsequent e-mails. Now, in what form did they? I mean, there's knowing and there's knowing. So what exactly did they know on the 18th? Sean Lathrop raised a question, first of all, as to whether or not they had evidence about who had custody and whether or not they could actually give the child back to the father. He also raised a question of whether or not the temporary restraining order was an adequate basis or procedure for them to take the child and give the child to father. Yeah, that's not quite my question. Do they at that point know about the earlier order that says no contact? They know that there were decisions made, but they don't have the actual order. Okay. They only know what the parents of the child both told them in their interviews. Again, what point did they have the actual 2012 order? When I sent it to them immediately after the hearing on December 31st. So that's the first time they see the actual order. The actual order, yes. They've heard about it before that. Yes. And my understanding of the district court's order really is he needs more evidence to determine at what point did they have it in a clear enough form so that they should have then been on notice that that was inconsistent with the December 4th order. That's in part what Judge Seabright suggests, yes. But again, I think these are very complicated factual issues because, again, you have the social workers on the one hand going to my client's house and assessing it as a safe place. Then after December 31st, you'll see the e-mails, well, father is going to go back and try and get another order claiming custody. We need to go out there and change our assessment of Hannah David's safe house to enable him to do that. There are various ways, there are many ways in which we can show that these social workers were deliberately misstating facts in an effort to help dad get the kid back, and they were not concerned about their obligations. They were just adamant. One of the social workers, Dino, I can't remember his last name, said in his deposition that he was really angry at Hannah because she was constantly calling and saying, where's my daughter? So at trial, these social workers will be shown to have acted in a disgraceful manner and to have misrepresented deliberately on a number of occasions what was going on and what they knew or didn't know. For a jury to hear all that, in our view, will impact in a great detail as to how they determine liability and what that determination amounts to. Do you have any further questions? No, we have no further questions. Thank you. Thank you. Council, we'll put two minutes on the clock. Thank you, Audra. First, I would just like to clarify that the 2012 order, it doesn't say no contact between Keahiolalo and BD. It bars contact between Keahiolalo and Hannah. So there's no language in the 2012 order that prevents Keahiolalo and daughter from contact. Now, the order did, within the order, Keahiolalo did stipulate to give up his custodial rights and visitation rights. However, there is no contact provision between Keahiolalo and the daughter. I think that's a critical issue. It's also been referred to loosely as a termination of his parental rights. I do not believe his parental rights were terminated. Is that correct? There was no formal... I'll take yes for an answer if that's right. It wasn't. Okay, thank you. Thank you. Custodial rights here, whether or not Mr. Keahiolalo had them, I think it's a red herring because there's nothing in the state statute governing temporary restraining orders barring someone in Keahiolalo's position as a father, as a person with a child in common, as a person related by co-sanguinuity from seeking to petition the court for the order and receiving the order that he got. There was nothing in state law to prevent Mr. Keahiolalo from doing that. I guess I just would also like to add that there's no clearly established law in our circuit that I could find, and certainly I don't believe plaintiffs could find, that discuss a situation such as this where a parent had a temporary restraining order, a court order on them, barring contact from their kids. I mean, the cases that we're talking about, Wallace, Keats v. Coyle, those differ in a huge way from this one, and that is those parents weren't enjoined from contact with their kids. Yeah, but you're ignoring the fact that at some point that TRO dissolved. So even if we were to agree with you that the December 20th removal was authorized by the TRO, I think your bigger problem is that after it was dissolved, you can't rely on this argument anymore. And it doesn't sound to me like you have another argument to authorize the removal after the TRO dissolved. I think I need to clear just a couple facts up. December 31st, temporary restraining order hearing, temporary restraining order is dissolved as to BD. January 1st, Mr. Seitz emails Ms. Suda at the Attorney General's office with a copy of the order. January 1st is a holiday. January 2nd, Ms. Suda meets with CWS to discuss the matter. January 3rd, Mr. BD is removed from Keahiulalo's home. January 4th, 5th, and 6th, a petition for temporary foster custody is filed on January 6th. So each of these matters happen within, I guess, the statutorily allowed time frame. And taking into account the video, Ms. Davis' behavior throughout the course of the last week or so between what had been going on, the petition was filed. And I do think it's very important that Ms. Davis stipulated to the court's finding that there was adequate basis to sustain the petition to find that there was a... It was reasonable to believe there was a threat of imminent harm based on what was alleged. I have to stop you because we're well over time again. Thank you, Your Honor. We appreciate your argument, both of you, and we'll take that matter under advisement.
judges: FLETCHER, CHRISTEN, DESAI